**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**

| | |
|---|---|
| NAVIGATOR HEARTLAND GREENWAY LLC, | |
| *Plaintiff*, | CASE NO. 4:23-cv-272 |
| v. | **COMPLAINT** |
| STORY COUNTY, IOWA and STORY COUNTY BOARD OF SUPERVISORS, | |
| *Defendants*. | |

COMES NOW the Plaintiff, Navigator Heartland Greenway LLC ("Navigator" or "Plaintiff"), by and through its undersigned attorneys, and submits the following Complaint against Story County, Iowa ("Story County") and the Story County Board of Supervisors (the "Board of Supervisors" or, collectively with Story County, "Defendants"), (collectively, "Defendants"), and states and alleges as follows:

## NATURE OF THE CASE

1. This case concerns another unprecedented decision by a single Iowa county to disregard extensive federal and state regimes governing the construction of carbon dioxide ("$CO_2$") sequestration pipelines and to purportedly reserve for itself the right to determine whether such pipelines can be constructed in the State. Because this decision reflects an unlawful usurpation of federal and state regulatory power, tramples on the ability of all other Iowa counties to weigh in on the pipeline project and renders superfluous the pipeline permitting regime established by the Iowa legislature, Defendant Story County's offending ordinance must be found unlawful, preempted, and void.

2.      As further detailed below, Navigator, its parent company, Navigator CO2 Ventures LLC, and other affiliated entities are developing an interstate $CO_2$ pipeline known as the Heartland Greenway Pipeline System ("HGPS") and related facilities (collectively with HGPS, "Heartland Greenway"), which will traverse several states, including Iowa. On May 16, 2023, Defendants passed County Ordinance No. 311 (the "Ordinance" or "Ordinance 311") (Exhibit 1), which establishes setback requirements that directly conflict with the route of Plaintiff's proposed pipeline and would purport to limit the route the Iowa Utilities Board (the "IUB") may ultimately approve or modify. In addition, the Ordinance purports to require specific methods of construction for Plaintiff's project, as well as to require the submission of a County Emergency Response Plan and establish a separate discretionary permit requirement. In so doing, Defendants not only usurp federal and state regulatory power over carbon dioxide pipeline construction but also superimpose their preferences regarding Plaintiff's project over all other relevant stakeholders, including Iowa's other 98 counties, the IUB, the Iowa legislature, and the state's landowners, taxpayers, and citizens.

3.      In Iowa, interstate and intercounty hazardous liquid pipelines are regulated by extensive federal and state statutory schemes.

4.      At the federal level, the Pipeline Safety Act ("PSA") expressly reserves the right to promulgate safety standards for interstate hazardous liquid pipelines to the federal Pipeline and Hazardous Materials Safety Administration ("PHMSA") and prohibits state or local authorities from adopting safety standards applicable to such pipelines. 49 U.S.C. § 60104(c).  Courts across the country have unequivocally and broadly held that local ordinances which attempt to adopt or impose *any* standards pertaining to pipeline safety are preempted by federal law and cannot stand. Federal pipeline safety standards apply to, among other things, the design, installation, inspection,

emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities. (49 U.S.C. § 60102(a)(2); 49 C.F.R. Part 195).

5.     PHMSA regulates $CO_2$ transported by a hazardous liquid pipeline. 49 U.S.C. § 60102(i); 49 C.F.R. Part 195. In public statements, PHMSA has made clear that it is actively exercising full regulatory authority over $CO_2$ pipelines, including Navigator's proposed pipeline project. *See, e.g.*, Linda Daugherty (PHMSA), Presentation to Iowa Legislature "PHMSA CO2 Safety and Regulatory Oversight" at 13 (Mar. 21, 2023) (indicating that PHMSA would have the authority to regulate "all three proposed large scale projects in IA [including Navigator's proposed pipeline]"); Statement of John Gale (PHMSA) PHMSA Carbon Dioxide Pipeline Safety Public Meeting (Des Moines, Iowa) at 3:47:48 (video recording) (Jun. 1, 2023) (affirmatively stating that the Navigator project is "currently covered by [PHMSA Part 195] regulations in existence today").

6.     At the state level, the Iowa legislature, through Chapter 479B, has granted the IUB sole and exclusive authority to determine whether an intercounty hazardous liquid pipeline should be built within the state, and—if so—through which route. Chapter 479B does so by requiring any company that wishes to build a hazardous materials pipeline in Iowa (a "pipeline company") to receive a permit from the IUB before beginning construction. In order to receive a construction permit, the proposed pipeline must undergo an exhaustive examination by the IUB, including a detailed analysis of the pipeline's proposed route and its impact on the economic, environmental, and societal welfare of Iowa's citizens, municipalities, and counties. Only after the IUB finds the pipeline will "promote the public convenience and necessity" *and* signs off on the *exact* route of the pipeline can a permit be issued and construction begin.

7.      To ensure the IUB is properly informed of and can properly assess the costs and benefits of a pipeline to Iowa's 99 counties, Chapter 479B provides extensive opportunity for county participation.

8.      First, a county may exercise its right to intervene in the IUB permit proceedings, in which case the intervening county is afforded full party status in the IUB's consideration of the relevant permit application through various means, including but not limited to the ability to send the pipeline company discovery requests, the ability to review and respond to the pipeline company's pre-filed testimony, the ability to submit pre-filed testimony in response, and the ability to participate in the pipeline company's evidentiary hearing before the IUB, which in turn entails the ability to present evidence, to present witnesses, and to cross-examine witnesses of other parties, including the pipeline company's own witnesses. Iowa Admin. Code r. 199–7.13(7) (noting a person granted leave to intervene is a party to the proceeding).

9.      Second, Iowa Code Chapter 479B invites Iowa counties to participate in the IUB's permitting process through a statutorily prescribed notice-and-objection process, during which counties may submit any and all objections they have regarding any given pipeline proposal to the IUB.

10.     Under Iowa law, the IUB is required to consider all evidence provided by intervening parties, as well as review each and every objection submitted, consider all this information in determining whether to grant a construction permit to a pipeline company, and issue a written ruling explaining why and how it reached its final permitting decision.

11.     Third, Chapter 479B explicitly requires applicants such as Navigator to provide information in their permit application regarding "[t]he relationship of the proposed project to the present and future land use and zoning ordinances." Iowa Code § 479B.5(7); Iowa Admin. Code

r. 199-13.3(1)(f)(2)(3). Through this requirement, information on county and local zoning ordinances and land use is addressed within the IUB process of determining the route, accounting for economic and environmental impacts, and determining whether the project is in the public convenience and necessity.

12.     Thus, in establishing Chapter 479B, the Legislature intended to create a uniform review and permitting process (overseen by the IUB) which would balance the important economic, environmental, and infrastructural benefits of pipeline construction projects with local concerns held by landowners, counties, and municipalities. History makes clear this process has succeeded in its goals, as the IUB has routinely evaluated the most detailed route considerations, often requiring highly specific revisions to proposed routes on the basis of their effect on a single plot of land (e.g., in a recent decision, the IUB required a pipeline route be moved approximately 900 feet to the north so that a farm's turkey operations would remain undisturbed by the prospective pipeline).

13.     On December 14, 2021, Defendants availed themselves of Chapter 479B's notice-and-objection process by submitting an objection to Navigator's proposed pipeline project to the IUB. (Exhibit 2).[1]

14.     And yet, rather than follow the statutory process afforded to Defendants and allow the IUB to render a reasoned and fair judgment on the project, on May 16, 2023, Defendants passed Ordinance 311.

15.     Defendants' unlawful Ordinance cannot stand for a number of reasons.

---

[1] By virtue of their submission of an objection to the docket in Navigator's IUB case, Defendants have recognized the IUB as the proper authority, pursuant to Chapter 479B, for analyzing and determining the proper siting and routing of Navigator's proposed Heartland Greenway pipeline.

16.     *First,* the Ordinance is preempted by federal law, including without limitation the PSA, related rules promulgated by the Pipeline and Hazardous Materials Safety Administration ("PHMSA"), other federal statutes, and the Supremacy Clause of the United States Constitution. The Ordinance impermissibly attempts to regulate interstate pipeline safety, which courts have repeatedly held is the exclusive purview of the federal government. Indeed, in recent public statements, PHMSA has specifically made clear it is exercising full safety and regulatory authority over Plaintiff's pipeline.

17.     *Second*, the Ordinance separately violates and is preempted by Iowa law, including without limitation Iowa Code Chapter 479B, which *inter alia* exclusively empowers the IUB to review, approve, or modify the exact location and route of any hazardous liquid pipeline within the state and issue a permit allowing a pipeline company to begin construction on that specific route. And yet, the Ordinance would superimpose Story County's siting preferences above the IUB's and, in so doing, purport to prohibit what the IUB expressly permits. The Ordinance would also fatally undermine the legislature's goal of facilitating uniform pipeline development in Iowa by having one body (here, the IUB) determine the proper siting and locations of a pipeline route and frustrate Chapter 479B's goal of establishing a democratic process through which various local preferences are weighed fairly by a neutral decision maker. The Ordinance would also functionally mean no pipeline could ever be built in Iowa regardless of the IUB's position, as pipeline companies would need to continually restart their IUB permitting applications when any one of Iowa's 99 counties adopted a new zoning ordinance. Because such outcomes conflict with the language, structure, and aims of 479B, the Ordinance is preempted by state law.

18.     *Third*, the Ordinance represents an improper, unlawful, and coordinated attack by the County against Plaintiff's project. Defendants do not have the technical, scientific, or

6

engineering expertise necessary to regulate carbon dioxide sequestration pipelines. Defendants' decision to enter this space despite their lack of knowledge or expertise in this area bears the hallmarks of arbitrary and capricious rulemaking. Moreover, the Ordinance is clearly the product of unlawful animus and caprice, as the County adopted the Ordinance with the sole (and unlawful) aim of delaying, hindering, and ultimately defeating Plaintiff's project. Allowing the Ordinance to stand would not only elevate the word of county zoning officials above highly specialized agencies like the IUB and PHMSA but would also encourage zoning boards to use the powers delegated to them to target specific landowners or projects they do not like.

19.     In finding the Ordinance preempted, the Court would not only be upholding the express statutory schemes intended by both the federal and state legislature but also following its own precedent. In *Couser v. Shelby Cnty.*, this Court found county setback requirements for $CO_2$ pipelines preempted by 479B. Case No. 1:22-cv-00020-SMR-SBJ, 2023 U.S. Dist. LEXIS 120257 (S.D. Iowa, Jul. 10, 2023). The Court also held the establishment of an independent discretionary permitting regime for $CO_2$ pipelines preempted by 479B's express permitting regime. Finally, the Court found emergency plan submission requirements preempted by PHMSA and the PSA. Given the near identical concerns implicated by Story County's Ordinance, the same result should follow here.

20.     Accordingly, Navigator brings this action seeking declaratory and injunctive relief against the enforcement of the Ordinance on the grounds that the Ordinance is preempted by both federal and state law, and the Ordinance is an arbitrary, capricious, and improper exercise of the Defendants' zoning powers.

## PARTIES

21.     Plaintiff Navigator is a limited liability company organized under Delaware law, with its principal place of business in Omaha, Nebraska, and is authorized to do business in Iowa.

22.     Defendant Story County, Iowa, is a county and governmental body under the laws of Iowa.

23.     Defendant Board of Supervisors is the governing body for Story County under the laws of Iowa.

## JURISDICTION & VENUE

24.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Navigator's claims occurred in the Southern District of Iowa ("District").

25.     The Court has personal jurisdiction over the Defendants as a result of their continuous and systematic contacts in the District.

26.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because certain claims by Navigator arise under federal law.

27.     The Court has supplemental jurisdiction over Navigator's state law claims in this action under 28 U.S.C. § 1367 because Navigator's federal and state claims are so related that they form part of the same case or controversy.

28.     This Court has the authority to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57 and 65.

## FACTUAL ALLEGATIONS

### A.     Navigator's $CO_2$ Pipeline

29.     Carbon dioxide, a greenhouse gas, is a natural byproduct of numerous manufacturing processes, including ethanol production and fertilizer production.[2]

---

[2] Uisung Lee, et al., *Using Waste CO2 from Corn Ethanol Biorefineries for Additional Ethanol Production: Life-Cycle Analysis* (Dec. 17, 2020) (available at https://onlinelibrary.wiley.com/doi/full/10.1002/bbb.2175).

30.     As a greenhouse gas, $CO_2$ poses substantial environmental concerns if released into the atmosphere in large quantities. Specifically, $CO_2$ absorbs and radiates heat, warming the planet and contributing to climate change and its disastrous effects. Increased atmospheric carbon dioxide is responsible for about two-thirds of the energy imbalance that is causing Earth's temperature to rise, which has direct and cascading effects on many things including weather, plants and agriculture, disease, water, and ecosystems.[3]

31.     Carbon capture and sequestration ("CCS") is a process which generally involves capturing $CO_2$ when it is generated and transporting it to a different location for safe storage.[4]

32.     Navigator, its parent company, Navigator CO2 Ventures LLC, and other affiliated entities are developing an interstate $CO_2$ pipeline known as the HGPS and related facilities for the purpose of CCS (collectively with HGPS, "Heartland Greenway").

33.     The Heartland Greenway Pipeline System will traverse Iowa, Illinois, Minnesota, Nebraska, and South Dakota and transport captured $CO_2$ from a substantial number of emitting facilities for storage.

34.     Heartland Greenway is being developed in two or more phases. The facts stated in this Complaint describe the first phase of the pipeline that is currently in development.

35.     In Iowa specifically, the HGPS will cross 33 of the State's 99 counties, including Defendant Story County.

---

[3] Rebecca Lindsey, National Oceanic & Atmospheric Admin., *Climate Change: Atmospheric Carbon Dioxide* (June 23, 2022) (https://www.climate.gov/news-features/understanding-climate/climate-change-atmospheric-carbon-dioxide).

[4] United States Geological Survey, *What is Carbon Sequestration?* (last visited Nov. 9, 2022) (available at https://www.usgs.gov/faqs/what-carbon-sequestration).

36.     Heartland Greenway will allow facilities qualified under Section 45Q(d) of the Internal Revenue Code of 1986, as amended, to receive a tax credit for using carbon capture equipment to dispose of qualified carbon dioxide in "secure geologic storage." Internal Revenue Code of 1986, as amended, § 45Q(a). Qualified carbon dioxide is defined as "carbon dioxide captured from an industrial source which (A) would otherwise be released into the atmosphere as industrial emission of greenhouse gas." PL 110-343, October 3, 2008, 122 Stat 3765. Facilities participating in Heartland Greenway that would fall within the definition of 45Q(d) include Iowa's ethanol, fertilizer, and agriculture industries.

37.     Further, Heartland Greenway will benefit carbon emitters inside and outside of the State of Iowa, which will have benefits to all Iowans from the reduced carbon emissions. CCS is a crucial part of the ethanol industry's commitment to reducing carbon intensity to 70% lower than petroleum gasoline by 2030, and carbon neutrality by 2050,[5] and only with projects like Heartland Greenway can the ethanol industry achieve such ambitious goals.

38.     For phase one of the project, Navigator and its affiliates have already secured agreements with 20 ethanol producers and one fertilizer facility along the planned pipeline route to support development of the HGPS that will have an initial $CO_2$ transportation capacity of approximately 10 million metric tons (MMt) per year. The carbon intensity score of the ethanol produced from plants using Heartland Greenway for sequestration can be reduced by as much as 50%,[6] making them more competitive in the low-carbon fuel markets that pay premiums for low

---

[5] Isaac Emery, et al., *Pathways to NetZero Ethanol: Scenarios for Ethanol Producers to Achieve Carbon Neutrality by 2050*, at 2 (Feb. 14, 2022) (available at https://d35t1syewk4d42.cloudfront.net/file/2146/Pathways%20to%20Net%20Zero%20Ethanol%20Feb%202022.pdf).

[6] Growth Energy, *Achieving Net-Zero Ethanol* (Sept. 2021) (available at https://growthenergy.org/wp-content/uploads/2021/09/GEBS-2021-04-Achieving-Net-Zero-Ethanol.pdf).

carbon ethanol. Further, ethanol plants that wish to market their $CO_2$ to industrial end users will have a transportation option to reach customers in scale that may otherwise be too far for traditional trucking options to be economic in the quantities demanded for such uses. This economic savings will allow industrial users such as food processors to potentially lower their costs and provide more cost-competitive products to the citizens of Iowa. $CO_2$ reduction by ethanol producers is crucial to the long-term survival and success of the industry.

39.     Heartland Greenway will also strengthen the agriculture industry in general and specifically in Iowa. Economically strong and durable ethanol and fertilizer plants benefit farmers. The ethanol industry is the largest purchaser of Iowa corn, consuming approximately 57% of Iowa's corn crop each year.[7] A stable ethanol industry provides Iowa's farmers with a reliable market for their corn and underpins the value of 26 million acres of Iowa farmland those crops are grown on.  Furthermore, low-carbon fertilizer produced in Iowa can become a high-value input into crop production, and farmers can realistically expect crops grown using such low-carbon fertilizer will command a premium over those using other higher-carbon inputs.

40.     Heartland Greenway will also provide direct benefits to communities located along and near the system footprint. These benefits will include, but are not limited to, providing: temporary construction employment; full-time, local jobs to operate and maintain the pipeline; right-of-way (ROW) payments; additional sales tax revenues from the sale of goods and services during construction and long term operation and maintenance of the pipeline; annual State and local community revenue from property taxes; and long-term support of regional contractors,

---

[7] Urbanchuk, *Contribution of the Renewable Fuels Industry to the Economy of Iowa*, at 1.

manufacturers, distributors, and retailers through ongoing purchase of goods and services to operate and maintain the pipeline system.

41.     Overall, the Heartland Greenway will increase the economic strength and durability of Iowa's manufacturing sector, especially the ethanol and fertilizer industries, which in turn benefits employees, suppliers, communities, citizens and governments in Iowa where the plants are located. The Heartland Greenway will also reduce the environmental impacts of fertilizer and ethanol productions, grow Iowa's economy, and bolster the State's reputation as a leader in the energy sector.

**B.     Iowa Code Chapter 479B**

42.     In Iowa, the construction and routing of interstate hazardous liquid pipelines is governed by Iowa Code Chapter 479B.

43.     In adopting Chapter 479B, the Iowa legislature intended for the IUB to be the exclusive authority vested with the responsibility of determining whether a hazardous material pipeline should be built in Iowa and where it should be built in Iowa. As explained in Section 479B.1:

> It is the purpose of the general assembly in enacting this law to grant the utilities board the authority to implement certain controls over hazardous liquid pipelines to protect landowners and tenants from environmental or economic damages which may result from the construction, operation, or maintenance of a hazardous liquid pipeline or underground storage facility within the state, to approve the location and route of hazardous liquid pipelines, and to grant rights of eminent domain where necessary.

44.     To facilitate these goals, Chapter 479B establishes a detailed process by which any party seeking to build a hazardous material pipeline in Iowa must obtain regulatory approval from the IUB through application for, and ultimately receipt of, a pipeline construction permit.

45. Parties seeking a pipeline construction permit are required to submit a detailed petition to the IUB regarding the future project. Among other things, Section 479B.5 requires any such party to include in the petition:

> . . . . 3. A legal description of the route of the proposed pipeline and a map of the route.
>
> 4. A general description of the public or private highways, grounds, waters, streams, and private lands of any kind along, over, or across which the proposed pipeline will pass.
>
> 5a. A description and a map of the public or private highways, grounds, waters, streams, and private lands of any kind under which the storage is proposed.
>
> 5b. Maps showing the location of proposed machinery, appliances, fixtures, wells, and stations necessary for the construction, maintenance, and operation of the hazardous liquid storage facilities.
>
> 6. The possible use of alternative routes.
>
> 7. The relationship of the proposed project to the present and future land use and zoning ordinances.
>
> 8. The inconvenience or undue injury which may result to property owners as a result of the proposed project.

46. In addition, the petitioning party must submit an affidavit stating that it held—prior to the petition's submission—informational meetings in each county in which the pipeline might be built informing landowners and counties of the proposed details of the project and legal rights available to affected landowners. Accordingly, the proposed route is largely determined well before the petition is submitted.

47. Under Chapter 479B, the submission of the petition triggers an extensive and robust administrative process, which includes, among other things, the submission of written objections,

written discovery, pre-filed witness testimony, and which culminates in a robust (and lengthy)[8] administrative evidentiary hearing whereby all parties are permitted to present witnesses, submit evidence, and cross-examine witnesses of all other parties. Through this deliberative and thorough process, any affected person, ***including Iowa counties***, may intervene as a party to the docket and/or file written objections to the IUB. In its review process, the IUB staff reviews and examines all details included in the petition, issues letters to the petitioning party requiring revisions to the proposed plan for more information, conducts route inspections, and reviews all evidence, testimony, and objections that have been received from all impacted parties. Chapter 479B requires the IUB to consider ***the petition, evidence and testimony from all parties, <u>and any objections received</u>*** in making its determination regarding the application. Traditionally, all interested parties are encouraged to submit briefings to the IUB. To the extent necessary, the IUB is permitted to "examine the proposed route of the pipeline" as well as call upon any testimony that would be helpful in reaching its determination. Iowa Code § 479B.8.

48.     After the hearing, Chapter 479B delegates the final decision on whether a pipeline should be built solely to the IUB. In granting the IUB this authority, the Legislature plainly intended for the IUB to take into consideration *all* competing interests and factors related to the construction of the pipeline, balance local interests with statewide interests, and to render a final reasoned decision, only permitting a pipeline project to commence upon a showing that the proposed services will "promote the public convenience and necessity." Chapter 479B also allows the IUB to grant a permit upon specific conditions. The IUB employs a meticulous process in

---

[8] The evidentiary hearing for Docket No. # HLP-2021-0001, a permit filed by Summit Carbon Solutions for their proposed $CO_2$ pipeline project, was recently scheduled to last from August 2023 through October 2023.  While not yet scheduled as of the date of filing this Complaint, Navigator expects its evidentiary hearing to be set for a similar duration.

considering applications for pipeline construction and carefully analyzes information provided by all parties, pursuant to the robust statutory and regulatory scheme under which it operates.

49.     Upon attainment of a pipeline construction permit, a pipeline company is authorized to begin construction of the pipeline and is granted eminent domain rights as necessary.

### C.     Navigator's Compliance with the 479B Process

50.     On October 25, 2022, Navigator filed a Petition for a Hazardous Liquid Pipeline Permit with the IUB under Iowa Code Chapter 479B ("Petition").  Before it filed its Petition, Navigator followed the procedures set forth in Iowa Code Chapter 479B and Chapter 13 of the IUB's administrative rules. Those procedures included, but were not limited to, determining a potential route and "corridor" within which the HGPS is proposed to be located. As set forth in Navigator's Petition, parameters regarding the proposed route included numerous federal requirements.

51.     Federal requirements guided the determination of the route, including but not limited to identifying inhabited structures, gathering places, and population centers based on initial modeling and avoiding areas of known cultural resources, including federal and state registered locations.

52.     Once the route corridor was established, Navigator requested that the IUB hold informational meetings in all affected counties, as required by Iowa Code 479B.4(3) and 199 Iowa Admin. Code 13.2. The informational meetings were presided over by representatives of the IUB. After the IUB certified that Navigator met each requirement in Iowa Code Chapter 479B and 199 Iowa Admin. Code Chapter 13.2(6), Navigator was permitted to conduct surveys under Iowa Code 479B.15 and negotiate with landowners.

53.     Thirty days after the informational meetings were concluded, Navigator was allowed to file its Petition for a hazardous liquid pipeline. Iowa Code 479B.4(3).  Navigator's

Petition included detailed information required by federal and state law, including without limitation those requirements in Iowa Code 479B.5 and 199 Iowa Admin. Code 13.3. After an IUB staff review, discovery, and the receipt of written testimony, a public hearing will be held by the IUB to determine if Navigator should be issued a permit for a hazardous liquid pipeline. *See* Iowa Code 479B.6.

54.    Navigator has already begun the process of surveying parcels along the proposed route for the project, securing necessary local, state, and federal permits, and working with landowners to obtain options for easements. To date, Navigator has paid over $725,000.00 to landowners in Story County for options to acquire easements in the future in connection with the Heartland Greenway project.

### D.    Defendants' Participation in the 479B Process

55.    As described above, upon submission of a Petition, Chapter 479B allows for extensive county participation, primarily through allowing counties to intervene in the pipeline permit proceeding and to submit objections to the IUB.

56.    On December 14, 2021, Defendants submitted an objection to Navigator's pipeline project to the IUB. (Exhibit 2). In their objection, Defendants raised to the IUB concerns that the HGPS is "proposed to transport hazardous liquid through Story County." (*Id.*) However, Defendants chose not to fully avail themselves of the IUB process: Defendants did not file a petition to intervene in Navigator's IUB docket. Had Defendants intervened,[9] they would have been afforded full party status in the IUB's process, including but not limited to the ability to participate in discovery, present witness testimony, and participate in the evidentiary hearing. Iowa

---

[9] Notably, Navigator has not objected to intervention by any other county and the IUB has granted intervenor status to all counties that have thus far moved to intervene.

Admin. Code r. 199-7.13(7) (noting a person granted leave to intervene is a party to the proceeding).

**E.      Defendants' Adoption of Now-Repealed Ordinance 310**

57.     On October 25, 2022, Defendants made their first attempt at unlawful rulemaking through passage of Story County Ordinance 310 (the "Repealed Ordinance").

58.     The Repealed Ordinance purported to establish setback requirements for hazardous materials pipelines in Story County. The County's setback requirements were illusory and were intended to serve as a ban on all pipeline development in the County, as no pipeline could be built in Story County under the prescribed setback limitations. The County thus devised the setback requirements with the express goal of preventing Plaintiff's project and interfering with the IUB's permitting review process.

59.     The Repealed Ordinance's supporting materials and documentation made clear that its intended purpose was to target Plaintiff's project, and the County had adopted the setback and other requirements, including emergency response requirements, with the goal of regulating interstate pipeline safety. Indeed, as Story County's Director of Planning explained in a memorandum published in conjunction with passage of the Repealed Ordinance, the purpose of the setback requirements was to reduce the safety risks in case of a spill or rupture:

> Recently, pipelines transporting hazardous liquids and gases between states have been proposed, and constructed, with routes through Story County. Because these pipelines do not provide essential services, and create greater risks in the event of a spill or rupture, the Story County Land Development Regulations are proposed to be amended to require setbacks from dwellings and other uses that pose evacuation challenges.

(Exhibit 3, pp. 4-5) (emphasis added). As the memorandum highlighted, "the proposed ordinance is limited to setbacks and the setbacks are the minimum necessary to protect public safety." *Id.*

60.     In response to the Repealed Ordinance, Plaintiff initiated litigation against Defendants, which remains pending, and alleged the Repealed Ordinance was preempted by federal and state law. Particularly relevant here, Plaintiff alleged in its lawsuit that the express purpose of the Repealed Ordinance's setback requirements was "to protect public safety," placing it squarely within the regulatory space exclusively occupied by the federal government.

### F.     Defendants' May 2023 Adoption of the Ordinance

61.     In the midst of the ongoing litigation regarding the Repealed Ordinance, on May 16, 2023, Defendants passed the Ordinance, which further amended Chapters 85 and 86 of the Story County Code of Ordinances ("Story Code").  (Exhibit 1).

62.     As with the Repealed Ordinance, the Ordinance establishes setback requirements for a broad array of structures, including, among other zoned areas, dwellings, retirement and nursing homes, family homes, schools, childcare homes and centers, group homes, hospitals, detention facilities, human service facilities, campgrounds, day camps, cemeteries, stables, amphitheaters, shooting ranges, golf courses, stadiums, parks, houses of worship, and auditoriums. (Exhibit 1, at p. 7). And, as with the Repealed Ordinance, the setback requirements were designed and devised to prevent *any* pipeline construction in Story County, as no pipeline can be built in Story County while complying with the setback requirements.

63.     The Ordinance also requires the submission of an emergency response or preparedness plan if required by PHMSA. The Ordinance, however, leaves it solely within the County's discretion to decide whether the emergency response plan required by PHMSA is sufficient for the County. (Exhibit 1, at pp. 4, 8).

64.     The Ordinance also imposes a requirement called "Critical Natural Resource Area Protections Required," which requires operators to use "only trenchless construction methods in

18

"required buffer areas from a critical natural resource." (Exhibit 1, at pp. 7-8).  The Ordinance, however, does not cite to any definition of "critical natural resource."  (*Id.*).

65.     Most remarkably, the County, in adopting Ordinance 311, attempts to disclaim its well-documented intent of enacting the setbacks in the first place, namely, to protect public safety. Notwithstanding the County's public statements to the contrary, (Exhibit 3), the Ordinance indicates the setbacks were implemented to further other aims, such as "historic patterns of development," protection of "the County's rural character," "reduction of incompatibilities between land uses including utilities," "intergovernmental coordination related to future urban development," "appropriate siting of new development," and "preservation of existing rural residential development." Noticeably absent from this list is public safety, despite the Director of the zoning board admitting, only months earlier, that the setbacks were instituted "**to protect public safety.**" (Exhibit 3, pp. 4-5)

66.     The Ordinance's proffered public purpose is nothing more than a pretextual post-hoc position adopted by the County in response to the pending litigation - and in attempt to overcome - Plaintiff's federal preemption claims. As the Director of the planning and zoning board made clear, the setback requirements were adopted by the County to further "public safety." Those requirements are thus preempted by federal law. And because those setbacks also affect the siting of the pipeline, they are also expressly preempted by §479B.

67.     Absent invalidation, the Ordinance threatens to cause substantial damage to Navigator by altering the planned layout of the HGPS, causing undue delays in execution of the project, creating undue financial hardship for Navigator and potentially landowners relating to inefficient routing, and/or making the project economically and practically impossible or nearly impossible to site in Story County in any efficient manner, resulting in severe financial harm.

68.     Further, if Navigator is not afforded relief here, any one of Iowa's other 98 counties may attempt to announce additional and potentially inconsistent regulations of their own, throwing Navigator's entire pipeline project into disarray and chaos.

69.     From an operational perspective, uniform and consistent standards implemented by PHMSA are designed to promote operational consistency and safety.

70.     The federal and state frameworks, which were intended to create uniform requirements for pipelines, would be upended if counties could make their own rules in this field.

**G.     Federal Preemption**

71.     Navigator's HGPS $CO_2$ pipeline is a hazardous liquid pipeline under both federal and state law.

72.     Federal law exclusively regulates a number of aspects of hazardous liquid pipelines, including without limitation safety standards for $CO_2$ pipelines.  *See e.g.*, 49 U.S.C. § 60104(c).

73.     Navigator's HGPS is subject to a number of federal regulations, including without limitation regulations and standards relating to safety of pipelines and the transporting of carbon dioxide. The PSA gives the federal government exclusive authority to regulate interstate pipeline safety, which includes construction, design, operations, and maintenance.  49 U.S.C. § 60102. Congress enacted the PSA in 1994 "to recodify, without substantive change," the Natural Gas Pipeline Safety Act of 1968 and the Hazardous Liquids Pipeline Safety Act of 1979. The PSA's purpose "is to provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities." 49 U.S.C. § 60102(a)(1).

74.     Pursuant to the PSA, the United States Department of Transportation ("USDOT") must "prescribe minimum safety standards for pipeline transportation and for pipeline facilities," 49 U.S.C. § 60102(a)(2), "regulate carbon dioxide transported by a hazardous liquid pipeline

facility," and "prescribe standards related to hazardous liquid to ensure the safe transportation of carbon dioxide by such a facility." 49 U.S.C. § 60102(i)(1).

75.     When prescribing standards, the USDOT is required to design any promulgated regulation to account for "safely transporting hazardous liquids, as appropriate; and protecting the environment."  49 U.S.C. § 60102(b)(1)(B).

76.     To implement the requirements of the PSA, the USDOT delegates its authority to PHMSA. 49 U.S.C. §§ 108(a), 108(f). That authority extends to the regulation of interstate pipelines, which are defined as "a pipeline or that part of a pipeline that is used in the transportation of hazardous liquids or carbon dioxide in interstate or foreign commerce." 49 C.F.R. § 195.2 (defining "interstate pipeline"); *see also* 49 U.S.C. § 60101(a)(7) (defining "interstate hazardous liquid pipeline facility").

77.     With respect to the regulation of interstate pipelines, the PSA provides that a "State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." 49 U.S.C. § 60104(c).

78.     The $CO_2$ that would be transported through the HGPS is regulated as a hazardous liquid pipeline facility under the PSA. 49 U.S.C. § 60102(i); 49 C.F.R. § 195.0 ("This part prescribes safety standards and reporting requirements for pipeline facilities used in the transportation of hazardous liquids or carbon dioxide."). As such, Navigator's proposed pipeline will be regulated by PHMSA as an interstate hazardous liquid pipeline facility, and Navigator is designing its project to comply with applicable PHMSA standards promulgated pursuant to the PSA. *Id.*

79.     PHMSA has repeatedly confirmed it exercises both safety and regulatory authority over $CO_2$ pipelines, specifically including Plaintiff's proposed HGPS interstate pipeline, expressly removing from any other authority the ability to impose regulations related to the pipeline's safety.

80.     PHMSA regulates the transportation of hazardous liquids at 49 C.F.R. Part 195. These regulations set forth the minimum standards by which pipeline operators are required to design, construct, operate and maintain their systems.

81.     At 49 C.F.R. Part 195, PHMSA implements a variety of regulations applicable to hazardous liquid pipelines, including those that transport $CO_2$. In part, these regulations implement requirements related to construction, operations and maintenance, emergency response, public awareness, and abandonment of pipelines. *See, e.g.*, Part 195, Subpart A (General); Subpart B (Annual, Accident, and Safety Related Condition Reporting); Subpart C (Design Requirements); Subpart D (Construction); Subpart E (Pressure Testing); Subpart F (Operations and Maintenance, including Emergency Response, Public Awareness Plans, and Leak Detection); Subpart G (Qualification of Pipeline Personnel); and Subpart H (Corrosion Control).

82.     As part of its mandate to design regulations to protect the environment, PHMSA implements regulations that impose additional design, construction, and operations requirements for pipelines located in certain environmentally sensitive areas, including "unusually sensitive areas" as defined by 49 C.F.R. § 195.6. These areas include "a drinking water or ecological resource area that is unusually sensitive to environmental damage from a hazardous liquid pipeline release." *Id.* PHMSA's regulations require operators with pipelines located where they could affect these areas to implement certain design and construction requirements (e.g., type of valve and valve spacing) and develop and implement comprehensive integrity management programs that include continual assessment of the pipeline, data integration, criteria for remedial actions to

address integrity issues, and identification of preventive and mitigative measures to protect the area surrounding the pipeline. 49 C.F.R. § 195.452(f).

83.     At 49 C.F.R. Part 195, Subpart D, PHMSA imposes a variety of requirements related to pipeline construction, including that "[e]ach pipeline system must be constructed in accordance with comprehensive written specifications or standards that are consistent with the requirements of this part." 49 C.F.R. § 195.202. PHMSA construction regulations impose a variety of requirements, including, among others, inspections (§ 195.204), pipeline location (§ 195.210), welding procedures (§ 195.214), welding inspections (§ 195.228), installing pipelines in a ditch (§ 195.246), backfilling (§ 195.252), depth of cover which varies based on pipe location, including certain water crossings (§ 195.248), and the location and installation of valves (§§ 195.258, 195.260, 195.418). Additionally, pursuant to 49 C.F.R. § 190.401, PHMSA may elect to conduct a "facility design and/or construction safety review or inspection in connection with a proposal to construct, expand, or operate a . . . carbon dioxide facility."

84.     As part of these construction regulations, PHMSA requires that a "[p]ipeline right-of-way must be selected to avoid, as far as practicable, areas containing private dwellings, industrial buildings, and places of public assembly." 49 C.F.R. § 195.210(a). In particular, the regulation states that "[n]o pipeline may be located within 50 feet (15 meters) of any private dwelling, or any industrial building or place of public assembly in which persons work, congregate, or assemble, unless it is provided with at least 12 inches (305 millimeters) of cover in addition to that prescribed in § 195.248." *Id.* at § 195.210(b).

85.     Additionally, PHMSA imposes emergency response requirements on operators of hazardous liquid pipelines at 49 C.F.R. § 195.402(e). This provision requires operators to develop emergency response manuals that include certain elements, including but not limited to a process

for "[n]otifying the appropriate public safety answering point (i.e., 9–1–1 emergency call center) . . . to coordinate and share information to determine the location of the release, including both planned responses and actual responses during an emergency," "prompt and effective response to a notice of each type of emergency, including . . .accidental release of [ . . .] carbon dioxide from a pipeline facility," and a process for "[h]aving personnel, equipment, instruments, tools, and material available as needed at the scene of an emergency." *Id.*

86.     By design, the PSA "leaves nothing to the states in terms of substantive safety regulation of interstate pipelines, regardless of whether the local regulation is more restrictive, less restrictive or identical to the federal standards." *ANR Pipeline Co. v. Iowa State Com. Comm'n*, 828 F.2d 465, 470 (8th Cir. 1987).

87.     Like States, counties do not have the authority to intrude on the federal government's exclusive authority in this area. *See, e.g.*, *N. Border Pipeline Co. v. Jackson Cnty.*, 512 F. Supp. 1261, 1266 (D. Minn. May 1, 1981) (holding that federal law preempted a county's attempt to regulate in the area of pipeline safety and the county was "without authority to regulate cover requirements for interstate natural gas pipelines.").

88.     Accordingly, the PSA preempts state and local laws that seek to regulate the safety of interstate pipeline systems, in part, to ensure these systems are not subject to a patchwork of regulation, which impairs the pipeline operator's ability to operate and maintain its system and ensure safety.

89.     Like States, counties do not have the authority to intrude on the federal government's exclusive authority in this area. *See, e.g.*, *N. Border Pipeline Co.*, 512 F. Supp. at 1266.

90.     The Ordinance seeks to regulate with respect to pipeline safety of interstate pipelines in two key areas that are already the subject of federal regulations promulgated at 49 C.F.R. Part 195.

91.     First, the Ordinance seeks to impose quarter-mile setback requirements that are at odds with certain requirements imposed by PHMSA at 49 C.F.R. § 195.210 ("Pipeline location"). These federally mandated requirements already impose location requirements applicable to interstate hazardous liquid pipelines, including HGPS. Moreover, the administrative record makes clear the County adopted the setbacks to serve as substantive safety regulations. (Exhibit 3, pp. 4-5). As made clear by controlling federal precedent, counties do not have the right to impose substantive safety regulations over interstate pipelines. *See ANR Pipeline*, 828 F.2d at 470.

92.      Additionally, the Ordinance seeks to regulate emergency response plans despite the fact that emergency response plans are within the purview of pipeline safety and should be left exclusively to the jurisdiction of PHMSA.

93.     In the Repealed Ordinance, Defendant Story County attempted to require operators to include very specific information in their emergency response plans. Plaintiff brought suit, highlighting the fact that these requirements were preempted by federal law and the PSA. In response, Defendants passed the Ordinance in May 2023 in an attempt to circumvent preemption and federal law by requiring operators to submit emergency response plans and providing the County with the broad and unfettered authority to "determine whether the plan is sufficient for the County to plan its own emergency response and . . . request additional information" from the operator as needed. (Exhibit 1, p. 8). Although the Ordinance has been constructed to disguise Defendant Story County's intent, the broadly worded nature of this requirement and the breadth of the County's discretion provide the same result: a requirement that seeks to supplant the emergency

response planning requirements set forth by federal law and PHMSA's exclusive oversight authority. As such, the emergency response requirement provided in the Ordinance is preempted by federal law and the pipeline safety requirements, including those at 49 C.F.R. 195.402.

94.     The Ordinance also imposes pipeline construction limitations in certain areas by requiring the use of trenchless technology during pipeline installation. As indicated above, PHMSA maintains comprehensive regulations applicable to pipeline construction and which will apply to the construction of the HGPS. Defendant Story County does not have the authority to regulate the construction of the HGPS or any interstate hazardous liquid pipeline regulated by PHMSA.

95.     To the extent that the Ordinance seeks to impose an additional construction standard to protect a "Critical Natural Resource Area," PHMSA's regulations – as required by the PSA – were promulgated to account for both pipeline safety and protection of the environment. 49 U.S.C. § 60102(b)(1)(B). Moreover, any pipeline installed in an area that meets the definition of PHMSA's "unusually sensitive area" (which includes certain drinking water and ecological resource areas) will be subject to increased regulatory requirements as it relates to design, construction, and operation of the pipeline which are aimed to verify and maintain the integrity of the pipeline and provide additional protections for these areas. 49 C.F.R. §§ 195.6; 195.260; 195.418; 195.452. The Ordinance is preempted by PHMSA's exclusive authority to regulate the safety of interstate pipelines under the PSA, including pipeline design, construction, and operation.

96.     If applied, the Ordinance would violate the PSA and other federal statutes and impose construction, location, and emergency response requirements on an interstate pipeline system that is already subject to PHMSA's federal pipeline regulations. Preemption is confirmed

by this Court's ruling in *Couser*, which found that the PSA's "express preemption invalidates the Ordinance's emergency response and hazard mitigation provisions." *Id.*

97.     Defendants' attempt to regulate the construction, location, and emergency response planning of an interstate pipeline under the Ordinance is preempted by federal law and is thus violative, improper, and injurious to Navigator.

**H.     State Preemption**

98.     Navigator's HGPS is also subject to a number of state regulations, including without limitation those in the Iowa Code and those promulgated by the IUB.

99.     Pursuant to Chapter 479B, the IUB has exclusive authority over the decision whether a pipeline should be built in Iowa, and, if so, the location and routing of said pipeline. *See e.g.,* Iowa Code § 479B.1; Iowa Admin. Code r. 199–13.

100.     Under Iowa law, the IUB is authorized "to approve the location and route of hazardous liquid pipelines." Iowa Code § 479B.1.

101.     The IUB has promulgated extensive regulations detailing its approval of the location and route of such pipelines. *See, e.g.*, Iowa Admin. Code r. 199–13.

102.     479B states that a pipeline company "shall not construct, maintain, or operate a pipeline . . . under, along, over, or across any public or private highways, grounds, waters, or streams of any kind in this state except in accordance with Chapter 479B." Iowa Code § 479B.3.

103.     As described above, the IUB's process was designed to encourage county participation. Defendants or any other persons can file written objections with the IUB to the proposed construction, maintenance, operation, or application for a permit for a pipeline in Iowa or any other aspect of that pipeline, and many have done so already. Iowa Code § 479B.7 ("1. A person, ***including a governmental entity***, whose rights or interests may be affected by the proposed

pipeline or hazardous liquid storage facilities may file written objections. 2. All objections shall be on file with the board not less than five days before the date of hearing on the application. However, the board may permit the filing of the objections later than five days before the hearing, in which event the applicant must be granted a reasonable time to meet the objections.") (emphasis added). The IUB can consider any such objections at the hearing on whether to grant the requested permit.

104.    While the legislature intended for the IUB to consider county feedback during its 479B review, it delegated to the IUB exclusive authority to determining the route of any pipeline in the State, including which counties the pipeline might go through and by which path. Because the Ordinance steps into this exclusively regulated field, purports to adopt siting regulations that exist above the IUB's own siting determinations, and destroys the 479B process, it is thus preempted.

105.    Indeed, the setback requirements in the Ordinance (Exhibit 1, p. 7) would render provisions in Chapter 479B's statutory scheme superfluous and functionally irrelevant.

106.    Most obviously, Navigator's exact proposed pipeline route through Story County is currently being reviewed by the IUB (including, necessarily, the setback distances in the route from different structures). And yet, even upon the IUB's approval of this route, Story County would purport to supersede IUB's judgment by holding construction could not occur unless separate quarter-mile setbacks are accommodated. (Exhibit 1, at 7). Such a result would mean a county could prohibit a route that the State has permitted, which is expressly prohibited under Iowa preemption law.

107.    Other examples abound of the conflicts created by the Ordinance. For example, if the Ordinance were considered lawful and effective, Navigator would be required to amend its

plans, which in turn would potentially require, at a minimum, the issuance of new notices to landowners, new informational meetings, and the submission of a new routing map to the IUB for its subsequent inspection, analysis, and review. Most remarkably, nothing would prevent Defendants from, thereafter, once again amending the Ordinance to create new setback requirements, restarting the process and preventing the IUB from ever receiving a final permit application as, due to changes required by each new ordinance, Iowa Code Chapter 479B and the IUB's rules may require new informational meetings, new surveys, new evidentiary submissions, or other actions. This could go on forever, effectively ensuring the IUB would never be able to consider any pipeline project. And yet, if the Ordinance is allowed to go into effect, this is the exact system that would *de facto* govern pipeline development in Iowa on a county-by-county basis.

108.    The rerouting of any pipeline by a county would also be made in isolation from the decisions made by the counties upstream and downstream from that county. Therefore, there would be a very real and likely instance where one route by a county could force the pipeline into an entrance or exit point at the surrounding counties that are inconsistent with each other, making the construction of an intercounty, interstate pipeline impossible, violating the Iowa Legislature's intentions in passing Chapter 479B.

109.    The Ordinance would not only frustrate the purpose of the statutory scheme in Chapter 479B but would also punish all other Iowa counties that complied with the applicable statutes and intervened and/or submitted their objections and concerns to the IUB, entrusting that the statutorily mandated process would produce the best results for Iowa. If allowed to stand, Defendants' actions would render the IUB's entire objection process obsolete and meaningless. This is the opposite of the Legislature's intent expressed in Iowa Code Chapter 479B.

29

110.    State preemption of the Ordinance's setback requirements is confirmed by this Court's decision in *Couser*. As the Court made clear, because County setback requirements would "create[] a serious possibility the IUB would approve the construction of the pipeline but [the pipeline company] would be unable to build because it could not comply with the requirements of the Ordinance," the Ordinance was preempted, as this potential for conflict was the exact "situation . . . that preemption is designed to avoid." Case No. 1:22-cv-00020-SMR-SBJ, 2023 U.S. Dist. LEXIS 120257, at *33 (S.D. Iowa July 10, 2023). And, as the Court confirmed, analysis of 479B's statutory scheme made clear "the Legislature did not envision a role for counties in regulating the location of pipelines." *Id.* at *33-34. In particular, the Court observed that while 479B did expressly assign a role for county board of supervisors in some provisions, *e.g.*, § 479B.20, it did not do so in the location provisions of the statute.

111.    Defendants' attempt to regulate pipelines in Iowa under the Ordinance, including the location and route of such pipelines, is preempted by state law and is thus violative, improper, and injurious to Navigator.

## COUNT I: DECLARATORY JUDGMENT –
## FEDERAL PREEMPTION OF THE ORDINANCE

112.    Plaintiff restates and realleges the foregoing allegations as if set forth fully herein.

113.    Under the Supremacy Clause, "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

114.    Thus, state and local laws, ordinances, and other regulations that conflict with federal law are "without effect."  *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981).

115.     Defendants' Ordinance is preempted by federal law, including without limitation 49 C.F.R. Part 195, and the PSA and the regulations promulgated thereunder, and other federal statutes, due to the doctrines of express, field, and conflict preemption.

116.     Defendants had no authority to issue the Ordinance, and it is invalid. The right to regulate the safety of interstate pipelines is exclusively vested with the federal government and PHMSA has established such regulations. By Defendants' own public admissions, the construction, setback, and emergency response plan requirements were established out of public safety concerns. As such, they improperly interfere with federal safety regulations and step into a field exclusively reserved for federal oversight.

117.     The Ordinance stands as an obstacle to accomplishing Congress' full purposes and objectives, and it is preempted, for the same reasons that led the Court to invalidate Shelby County's emergency plan requirement in *Couser*.

118.     Navigator seeks a declaratory judgment that the Ordinance is invalid, unenforceable, null and void, without effect, and preempted by federal law.

## COUNT II: DECLARATORY JUDGMENT –
## STATE PREEMPTION OF THE ORDINANCE

119.     Plaintiff restates and realleges the foregoing allegations as if set forth fully herein.

120.     The Iowa Legislature granted the IUB authority to approve numerous issues relating to hazardous liquid pipelines in Iowa, including without limitation the location and routing of hazardous liquid pipelines.

121.     Iowa Code Chapter 479B sets forth the exclusive process for pipeline companies to follow in Iowa in order to obtain a permit from the IUB to locate and construct a hazardous liquid pipeline in Iowa.

122.     The setback requirements in Defendants' Ordinance are intended to, or have the effect of, dictating the location and routing of hazardous liquid pipelines in Story County.

123.     These setback requirements in the Defendants' Ordinance cannot be reconciled with the State's and the IUB's exclusive duties to regulate, oversee, and approve the routing and location of the Navigator Pipeline.

124.     Defendants' Ordinance is preempted by state law, including without limitation interfering with the IUB's duties and authority under Iowa Code Chapter 479B and Iowa Admin. Code r. 199–13.3.

125.     The Ordinance is also preempted under applicable law, including Iowa Code Chapter 479B and the regulations promulgated thereunder, due to the doctrines of express, field, and conflict preemption.

126.     The Ordinance would have the effect of making the route approved by the IUB illegal.

127.     Under Iowa law, "a county's exercise of home rule power cannot be 'inconsistent with the laws of the general assembly.'" *Goodell v. Humboldt County*, 575 N.W.2d at 486, 500 (Iowa 1998) (quoting Iowa Const. art. III, § 39A). "Thus, the constitutional grant of home rule power is carefully qualified so as to withhold the grant of power where it conflicts with [a] state statute." *Id.* (alteration in original) (citation and quotation marks omitted); *see also Mall Real Est., L.L.C. v. City of Hamburg*, 818 N.W.2d 190, 195 (Iowa 2012) ("[L]egislative power trumps the power of local authorities when the legislature exercises its power." (citation and quotation marks omitted)).

128.     Under Iowa law, local regulations and ordinances that conflict with or are irreconcilable with state law are preempted and invalid. *See Goodell*, 575 N.W.2d at 500–01; *Mall*

*Real Est.*, 818 N.W.2d at 196; *Worth Cnty. Friends of Agric. v. Worth County*, 688 N.W.2d 257, 262 (Iowa 2004). When a "local ordinance would prohibit an activity absent compliance with the additional requirements of local law, even though under state law the activity would be permitted because it complied with the requirements of state law," the regulation is "inconsistent with state law and preempted." *Goodell*, 575 N.W.2d at 501.

129.    The Ordinance stands as an obstacle to accomplishing the Iowa Legislature's full purposes and objectives, and thus is preempted, for the same reasons that led the Court to invalidate Shelby County's setback distance requirements in *Couser*. To the extent the Ordinance establishes an independent permitting regime, that too is preempted for the same reasons that led the Court to invalidate Shelby County's independent permitting regime in *Couser*.

130.    Navigator seeks a declaratory judgment that the Ordinance is invalid, unenforceable, null and void, without effect, and preempted by Iowa law.

## COUNT III: DECLARATORY JUDGMENT –
## INVALIDITY OF THE ORDINANCE

131.    Plaintiff restates and realleges the foregoing allegations as if set forth fully herein.

132.    Navigator seeks a judicial declaration that the Ordinance has no effect because it was an unlawful exercise of power by Defendants.

133.    Defendants' arbitrary and capricious enactment of the Ordinance violates Navigator's rights under the Fourteenth Amendment to the U.S. Constitution and the Iowa constitution.

134.    Zoning restrictions that are arbitrary and capricious run afoul of the Fourteenth Amendment's equal protection provision.

135.     Similarly, under Iowa law, zoning decisions may not be made in bad faith and with an improper purpose.

136.     The Ordinance is not supported by competent substantial evidence and was adopted in an arbitrary and capricious manner by parties with no expertise in these hyper-technical areas. The Ordinance was enacted based on location considerations that are solely within the domain of PHMSA and/or the IUB, both of which are staffed by experts in these areas.

## PRAYER FOR RELIEF

Plaintiff Navigator Heartland Greenway, LLC respectfully requests this Court enter judgment in its favor and against Defendants Story County, Iowa and the Story County Board of Supervisors on each and every claim set forth above and award Navigator appropriate relief including, but not limited to, the following:

a.     An order declaring under Federal Rule of Civil Procedure 57 that Ordinance No. 311 is preempted by federal and/or Iowa state law and is unlawful, invalid, unenforceable, without effect, and null and void as applied to Navigator's pipeline project;

b.     A preliminary and permanent injunction under Federal Rule of Civil Procedure 65, enjoining Defendants from (i) enforcing or implementing the Ordinance; (ii) enforcing or implementing any other similar ordinances; and (iii) enforcing or implementing any resolution, ordinance, moratorium, ban, or other regulation that purports or intends to regulate any aspect of Navigator's HGPS project, including but not limited to those regarding the location or routing of the pipeline;

c.     Awarding Navigator its costs and reasonable attorneys' fees under Federal Rule of Civil Procedure 54 and any other applicable authority;

d.     Awarding Navigator prejudgment and post-judgment interest as allowed by federal and/or state law; and

e.     An Order awarding all such other and further relief as this Court may deem just and proper under the circumstances.

NAVIGATOR HEARTLAND GREENWAY, LLC,
Plaintiff


By:  /s/ *Elizabeth A. Culhane*
     Elizabeth A. Culhane, AT0013212
     Katherine A. McNamara, AT0013579
     FRASER STRYKER PC LLO
     500 Energy Plaza
     409 South 17th Street
     Omaha, NE 68102
     Telephone: (402) 341-6000
     Facsimile:  (402) 341-8290
     eculhane@fraserstryker.com
     kmcnamara@fraserstryker.com
     ATTORNEYS FOR PLAINTIFF

3038161V6